575 S.E.2d 170

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**James Michael FLIPPO, Defendant Below, Appellant.**

No. 30527.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 6, 2002.

Decided Nov. 27, 2002.

George Castelle, Ira Mickenberg, Kanawha County Public Defender Corporation, Charleston, WV, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Silas B. Taylor, Senior Deputy Attorney General, Charleston, WV, for Appellee.

DAVIS, Chief Justice.

James Michael Flippo (hereinafter referred to as "Mr. Flippo"), appellant/defendant below, appeals from an order of the Circuit Court of Fayette County denying his motion for a new trial. In the motion for a new trial, Mr. Flippo contended that photographs of a third party, Joel Boggess (hereinafter referred to as "Mr. Boggess"), were unlawfully seized and therefore should not have been introduced as evidence during the trial. The trial court held that the photographs were lawfully seized under the implied consent or inevitable discovery exception to the warrant requirement. Therefore, the photographs were admissible during the trial. Alternatively, the trial court ruled that the introduction of the photographs was harmless error. Here, Mr. Flippo contends that the trial court committed reversible error by concluding that the photographs were admissible under the implied consent or inevitable discovery exception, and in finding harmless error in allowing the introduction of the photographs. After a thorough review of the briefs and record in this case, we find that the photographs were inadmissible under the implied consent or inevitable discovery exception. Having so ruled, however, we do agree with the trial court that introduction of the photographs in this case was, beyond a reasonable doubt, harmless error. We therefore affirm the circuit court's order denying a new trial.

## I.

### FACTUAL AND PROCEDURAL HISTORY

On March 1, 1996, Mr. Flippo and his wife, Cheryl Flippo, purchased a $100,000.00 life insurance policy on her life. The policy became effective on April 1, 1996. The policy named Mr. Flippo as the beneficiary. On April 27, 1996, Mr. Flippo accompanied Mr. Boggess to Babcock State Park for the purpose of having Mr. Flippo, who was a minister, baptize Mr. Boggess in a park stream. They went to the park in Mr. Boggess' red Camaro. After the baptism, Mr. Flippo took pictures of Mr. Boggess as he removed his wet clothing. At some point during the same day, Mr. Flippo telephoned the park and made reservations to rent a cabin for him and his wife on April 29, 1996, two days after the baptism.

During the early evening hours of April 29, 1996, Mr. Flippo and his wife traveled to Babcock State Park. The Flippos did not secure a key to the cabin as their arrival was late. However, the cabin was unlocked. Shortly after the couple arrived at the cabin, Mr. Flippo left briefly to use a pay phone.

At approximately 2:11 a.m. on the morning of April 30, 1996, the Fayette County 911 operator received a phone call from Mr. Flippo. During the call, Mr. Flippo stated that he and his wife had been attacked in their cabin. The 911 operator told Mr. Flippo to remain at the pay phone and help would be on the way. Deputy C. Bryant of the Fayette County Sheriff's Department responded to the emergency call. Deputy Bryant found Mr. Flippo at the pay phone wearing only his underwear. He had blood on his legs. Mr.

Flippo told the deputy that he had traveled to the park in a green Cadillac, but that it had been stolen. The deputy drove Mr. Flippo to the cabin. Upon arrival at the cabin, Deputy Bryant inquired about a red Camaro parked near the cabin. Mr. Flippo stated that he did not know who owned the Camaro, and that he had not come to the park in the Camaro.

Deputy Bryant left Mr. Flippo in his police cruiser and went to the cabin. The deputy found no signs of a forced entry into the cabin. He was also careful to note that, although it had been raining and the ground was soft, he found no footprints (other than his own) around the cabin area. When the deputy entered the cabin, he found the dead body of Mrs. Flippo lying between a bed and a wall. The deputy observed that Mrs. Flippo's skull was opened and her brain matter was exposed.

After discovering the body, Deputy Bryant went outside and found that two paramedics had arrived. One paramedic went into the cabin, while the other tended to Mr. Flippo. Once it was determined by the paramedic that Mrs. Flippo was dead, Mr. Flippo was taken to a local hospital. Deputy Bryant remained at the crime scene and conducted an investigation.

While Mr. Flippo was at the hospital, he was diagnosed as having a small bruise on his forehead and on the back of his head. He also had some scratches, with minimal bleeding, on his legs. During Mr. Flippo's treatment at the hospital, Fayette County Sheriff Detective S. Kessler arrived at the hospital. After receiving treatment at the hospital Mr. Flippo agreed to accompany the detective to police headquarters to give a statement.

While at police headquarters, Mr. Flippo informed the police that once he and his wife arrived at the cabin, he went out to a pay phone to call a sick friend who was at a hospital. After making the telephone call, he returned to the cabin and started a fire. Mr. Flippo stated that after he started the fire, he and his wife ate ice cream and played cards. Mr. Flippo reported that at some point after they went to bed, he heard a noise and saw a person lying between their bed and a wall. The intruder had a rope and was wearing a toboggan over his face. Mr. Flippo further stated that before he could alert his wife, the intruder hit him on the back of the head with a piece of firewood and knocked him unconscious. Mr. Flippo indicated that when he regained consciousness, he found the intruder sitting on him and cutting his legs with a knife. The intruder thereafter struck him in the forehead and knocked him unconscious once again. When Mr. Flippo regained consciousness a second time, the intruder was gone. After regaining consciousness, Mr. Flippo stated that he found his wife on the floor in a pool of blood. He reported that he placed his head on her heart and found it still beating. Thereafter, he rushed out of the cabin to call 911.

Shortly after Mr. Flippo gave his statement, Detective Kessler spoke by phone with a crime scene investigator, Detective G. Burke. Detective Burke reported that there was no forced entry into the cabin, the crime scene looked staged, and that certain items were not where they logically should have been. After the telephone call, at approximately 10:33 a.m., Mr. Flippo was informed that he was a suspect. He was read his *Miranda* rights.[1] After Mr. Flippo requested to speak with his attorney, all questioning of him stopped. However, at some point after the interrogation ended, Mr. Flippo requested medication and clothing be retrieved from the cabin.[2] Mr. Flippo's attorney arrived at police headquarters several hours later and took him away. On May 3, 1996, the police arrested Mr. Flippo and charged him with murdering his wife. Mr. Flippo was subsequently indicted for first degree murder by a grand jury.

1. *See Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966) (holding that a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.").

2. The medication and clothing were retrieved and given to Mr Flippo.

Prior to trial, Mr. Flippo made two motions relevant to this appeal. Mr. Flippo requested that the prosecutor be precluded from eliciting testimony that he had a homosexual relationship with Mr. Boggess. The trial court granted the motion. However, the trial court permitted the prosecutor to present evidence attempting to prove Mr. Flippo's relationship with Mr. Boggess had caused stress to his marriage. Mr. Flippo also sought to suppress the introduction of the photographs taken of Mr. Boggess undressing after his baptism.[3] The trial court denied the motion to suppress the photographs on the grounds that they were lawfully seized during the crime scene investigation.[4]

After the trial was bifurcated, the guilt phase was tried before a jury beginning on October 14, 1997. On October 23, the jury returned a verdict finding Mr. Flippo guilty of first degree murder. The following day, the jury heard evidence on sentencing and returned a verdict denying mercy. On November 3, the trial court sentenced Mr. Flippo to life in prison without mercy. On April 30, 1998, the trial court resentenced Mr. Flippo for the purposes of filing a timely appeal.

Mr. Flippo then filed a petition for appeal with this Court. The petition was summarily denied on January 13, 1999. Thereafter, Mr. Flippo appealed to the United States Supreme Court. A per curiam opinion was issued in *Flippo v. West Virginia*, 528 U.S. 11, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999), reversing and remanding the case to the trial court based upon the following reasoning:

A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement, *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), none of which the trial court invoked here. It simply found that after the homicide crime scene was secured for investigation, a search of "anything and everything found within the crime scene area" was "within the law."

This position squarely conflicts with *Mincey v. Arizona*, [437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)], where we rejected the contention that there is a "murder scene exception" to the Warrant Clause of the Fourth Amendment. We noted that police may make warrantless entries onto premises if they reasonably believe a person is in need of immediate aid and may make prompt warrantless searches of a homicide scene for possible other victims or a killer on the premises, *id.*, at 392, 98 S.Ct. 2408[, 57 L.Ed.2d 290], but we rejected any general "murder scene exception" as "inconsistent with the Fourth and Fourteenth Amendments—. . . the warrantless search of Mincey's apartment was not constitutionally permissible simply because a homicide had recently occurred there." *Id.*, at 395, 98 S.Ct. 2408[, 57 L.Ed.2d 290]; *see also Thompson v. Louisiana*, 469 U.S. 17, 21, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984) (per curiam). *Mincey* controls here.

Although the trial court made no attempt to distinguish *Mincey*, the State contends that the trial court's ruling is supportable on the theory that petitioner's direction of the police to the scene of the attack implied consent to search as they did. As in *Thompson v. Louisiana, supra* at 23, 105 S.Ct. 409[, 83 L.Ed.2d 246], however, we express no opinion on whether the search here might be justified as consensual, as "the issue of consent is ordinarily a factual issue unsuitable for our consideration in the first instance." Nor, of course, do we take any position on the applicability of any other exception to the warrant rule, or the harmlessness vel non of any error in receiving this evidence. Any such matters, properly raised, may be resolved on remand.

*Flippo*, 528 U.S. at 13–15, 120 S.Ct. at 8–9.

After the case was remanded to the trial court by the United States Supreme Court, the parties submitted briefs on the issue of the lawfulness of the seizure of the photo-

---

**3.** The photographs were found in a briefcase at the crime scene.

**4.** The State introduced three photographs of Mr. Boggess. One photograph was printed three times and the other two were printed twice.

graphs.[5] The trial court subsequently issued a lengthy order affirming the conviction and denying a new trial on June 15, 2001. In that order the trial court found that the photographs were seized based upon an "implied consent" to search the cabin by Mr. Flippo. Alternatively, the trial court found that the photographs were admissible under the "inevitable discovery" exception to the search warrant requirement. Finally, the trial court ruled that, to the extent the photographs were erroneously admitted into evidence, such error was harmless beyond a reasonable doubt. It is from this ruling that Mr. Flippo now appeals.

## II.

### STANDARD OF REVIEW

We are asked to determine whether the trial court properly denied Mr. Flippo's motion for a new trial. We have made clear that "[a]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).

The new trial motion in this case was based upon an alleged erroneous admission of evidence. In this regard, we stated in syllabus point 4 of *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998), that "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are

5. Counsel for Mr. Flippo declined to make an oral presentation on that issue.

6. While our review in this case focuses primarily upon the order denying the motion for new trial, we must also examine the trial court's ruling denying Mr. Flippo's motion to suppress. In this regard we have held that:

When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the

subject to review under an abuse of discretion standard." We formulated a more concise standard of review applicable to the denial of a motion for new trial in syllabus point 3 of *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000), as follows:

In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

This Court has also indicated that " '[a] judgment will not be reversed because of the admission of improper or irrelevant evidence when it is clear that the verdict of the jury could not have been affected thereby.' " *State v. Nichols*, 208 W.Va. 432, 436, 541 S.E.2d 310, 314 (1999) (quoting Syl. pt. 11, *State v. Wade*, 200 W.Va. 637, 490 S.E.2d 724 (1997)).[6]

## III.

### DISCUSSION

#### A. Consent Exception to a Search Warrant

Mr. Flippo contends that the trial court committed error in finding that the seizure of the photographs from the briefcase "were clearly admissible under the legal theory of an unrevoked, implied consent to search exception to the exclusionary rule." [7]

circuit court's factual findings are reviewed for clear error.
Syl. pt. 1, *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996).

7. The federal as well as the state constitution protects individuals in their homes against unreasonable searches and seizures. *See State v. Poling*, 207 W.Va. 299, 303, 531 S.E.2d 678, 682 (2000); *State v. Buzzard*, 194 W.Va. 544, 549, 461 S.E.2d 50, 55 (1995). This Court recently observed, in syllabus point 20 of *State v. Ladd*, 210 W.Va. 413, 557 S.E.2d 820 (2001), that:

Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment and Article III, Section 6

■ We have recognized that consent is one of the exceptions to the warrant requirement. In doing so, this Court has stated that " '[t]he general rule is that the voluntary consent of a person who owns or controls premises to a search of such premises is sufficient to authorize such search without a search warrant, and that a search of such premises, without a warrant, when consented to, does not violate the constitutional prohibition against unreasonable searches and seizures.' " Syl. pt. 1, *State v. Buzzard*, 194 W.Va. 544, 461 S.E.2d 50 (1995) (quoting Syl. pt. 8, *State v. Plantz*, 155 W.Va. 24, 180 S.E.2d 614 (1971)), *overruled in part on other grounds by State ex rel. White v. Mohn*, 168 W.Va. 211, 283 S.E.2d 914 (1981). This Court has observed that "[w]hether a consent to a search is in fact voluntary or is the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Syl. pt. 8, *State v. Craft*, 165 W.Va. 741, 272 S.E.2d 46 (1980). *Accord United States v. Matlock*, 415 U.S. 164, 169–172, 94 S.Ct. 988, 992–994, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). However, our cases have cautioned that "mere submission to colorable authority of police officers is insufficient to validate a 'consent' search or to legitimatize the fruits of the search, and evidence so obtained is incompetent against an accused." Syl. pt. 8, in part, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). We have also indicated that "the State must prove the voluntariness of the consent by a preponderance of the evidence." *State v. Worley*, 179 W.Va. 403, 410, 369 S.E.2d 706, 713 (1988). When it is shown that "the consent to search was not voluntary, the conviction must be set aside

unless the trial court can determine that the evidence introduced was harmless beyond a reasonable doubt." *State v. Harris*, 169 W.Va. 150, 153, 286 S.E.2d 251, 254 (1982).

Mr. Flippo correctly points out that our prior cases have only recognized express consent to search as an exception to the warrant requirement. Thus, Mr. Flippo contends that this Court should refuse to recognize the implied consent exception to a search warrant. Alternatively, Mr. Flippo contends that should this Court adopt the implied consent exception, the photographs still should have been suppressed because he invoked his *Miranda* rights prior to the seizure of the photographs, thereby revoking any implied consent to search. Separately, we will examine these two arguments.

**1. Implied consent exception.** The issue of whether or not implied consent to search is part of our jurisprudence, in the context of this case, is one of first impression. However, this issue is not novel to Anglo–American jurisprudence. Courts and commentators have recognized that "consent [to search] may be implied by the circumstances surrounding the search, by the person's prior actions or agreements, or by the person's failure to object to the search." Jeffrey Haninggan Kuras, et al., "Warrantless Searches and Seizures," 90 Geo. L.J. 1130, 1172 (2002). "Thus, a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.' " *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir. 1981). *See also United States v. Wesela*, 223 F.3d 656, 661 (7th Cir.2000) ("The district court reasonably concluded that Mrs. Wesela at the very least implicitly consented to the search."); *United States v. Gordon*, 173 F.3d

---

of the West Virginia Constitution—subject only to a few specifically established and well-delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative.

*See* Syl. pt. 1, *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980), *overruled on other grounds by State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991).

As a general rule, a warrantless search of an individual's home is constitutionally prohibited.

*See Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *State v. Peacher*, 167 W.Va. 540, 562, 280 S.E.2d 559, 574–75 (1981). This prohibition has been extended to a rented room occupied as a temporary residence by a person. *See Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964); *State v. Buzzard*, 194 W.Va. 544, 549, 461 S.E.2d 50, 55 (1995). Consequently, the rented cabin occupied by Mr. Flippo was entitled to the protections afforded by the federal and state constitutions against unreasonable searches and seizures.

761, 766 (10th Cir.1999) ("Non-verbal conduct, considered with other factors, can constitute voluntary consent to search."); *United States v. Gilbert*, 774 F.2d 962, 964 (9th Cir.1985) ("Appellant's request that the officers obtain her clothing necessarily implied consent to enter the bedroom in which she said the clothing was located."); *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir.1981) ("Moreover, it is well settled that consent may be inferred from an individual's words, gestures, or conduct."); *United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir.1975) ("An invitation or consent to enter a house may be implied as well as expressed."); *Phillips v. State*, 625 P.2d 816, 817 (Alaska 1980) ("In this case, we conclude that Mike Yakasoff voluntarily consented to the entry. Someone in the cabin, presumably he or his brother, summoned the police to the scene. Mike Yakasoff met Little when he arrived a short time later and directed him to the cabin, and there is no evidence suggesting that Yakasoff's actions were not voluntary."); *State v. Fleischman*, 157 Ariz. 11, 754 P.2d 340, 344 (App.1988) ("When a crime is reported to the police by an individual who owns or controls the premises to which the police are summoned, and that individual either states or suggests that it was committed by a third person, he or she implicitly consents to a search of the premises[.]"); *Alford v. State*, 291 Ark. 243, 724 S.W.2d 151, 154 (1987) ("We believe the trial judge was justified in inferring voluntary consent on Dennis's part since his cooperation throughout the officers' investigation and search was consistent with his denial of any involvement in a homicide."); *People v. Superior Court*, 41 Cal.App.3d 636, 116 Cal. Rptr. 24, 25 (1974) ("From our appraisal of the facts we think it clear that Henry's statement about the location of the gun amounted to an implied consent to look for it. Words may imply consent as well as express it.); *State v. Bryant*, [19 Conn.App. 626,] 563 A.2d 326, 328 (1989) ( [Defendant's] request that Gerovitz follow him to the trunk and watch him prop it open implied his consent to the officer's view of the trunk's contents."); *Steigler v. State*, 277 A.2d 662, 667 (Del.1971) ("We think that appellant's actions amounted to an implied consent to the search and seizure."), *vacated in part on other grounds by Steigler v. Delaware*, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972); *Zeigler v. State*, 402 So.2d 365, 372 (Fla.1981) ("[T]he police were at the store as a result of the invitation of the defendant. That invitation removed any application of *Mincey*."); *State v. Hanson*, 97 Hawai'i 71, 34 P.3d 1, 5 (2001) ("Consent may also be implied 'from an individual's words, gestures, or conduct.' "); *State v. Knapp*, 120 Idaho 343, 815 P.2d 1083, 1089 (App.1991) ("[W]e agree with the district court's ruling that Knapp impliedly authorized the officer to enter his motel room."); *People v. Rodgers*, 96 Ill.App.3d 416, 51 Ill.Dec. 695, 421 N.E.2d 203, 205 (1981) ("The principles of consent searches are well established. They are applicable where the consent is implied from actions as well as where expressly granted."); *State v. Jorgensen*, 526 N.E.2d 1004, 1006 (Ind.Ct. App.1988) ("The circumstances surrounding the search may demonstrate that the party involved implicitly gave consent, by word or deed."); *State v. Fredette*, 411 A.2d 65, 69 (Me.1979) ("There can be no doubt that the entry of the police into the Fredette home, and the conduct of Mrs. Fredette after the police had arrived, suggested her consent to their entry for the dual purpose of getting medical assistance for her husband and for determining who his assailant might have been."); *Lewis v. State*, 285 Md. 705, 404 A.2d 1073, 1080–1081 (1979) ("The defendant had indicated a purpose of cooperating with the police and then affirmatively made arrangements for the police to obtain a house key during his absence. In our judgment, these circumstances are sufficient to demonstrate that the search was freely and voluntarily consented to and therefore not violative of the Fourth Amendment."); *Thompson v. State*, 384 N.W.2d 461, 463 (Minn.1986) ("Thompson had consented, at least tacitly, to the search. Not only did Thompson voice no objection to the search, he gave every indication of a desire to cooperate with the police in finding his wife's assailant, to assist in apprehending the perpetrator of the crime."); *State v. Wright*, 735 S.W.2d 137, 140 (Mo.Ct.App.1987) (Defendant "gave his implied consent to the search for the weapon."); *State v. Koedatich*, 112 N.J. 225, 548

A.2d 939, 957 (1988) ("A consent sufficient to avoid the necessity of a warrant may be express or implied from the circumstances."); *State v. Davis*, 133 Or.App. 467, 891 P.2d 1373, 1379 (1995) ("[A]fter evaluating defen'dant's acquiescence to the officers' actions in the light of the circumstances, we conclude that defendant's actions constituted consent to the search and seizure conducted[.]"); *Commonwealth v. Daniels*, 280 Pa.Super. 278, 421 A.2d 721, 723 (1980) ("Appellant voluntarily opened the door when he saw uniformed police officers. He did not respond to the policemen's question and in doing so, we hold, consented to their entry at least so they could complete their questioning."); *State v. Wilshire*, 509 A.2d 444, 449 (R.I.1986) ("[W]e are of the opinion that the uncontradicted evidence could lead to only one conclusion on this issue, that defendant had issued both an express and a clearly implied invitation to examine the entire house to the police to determine whether a burglary had been an attendant circumstance of her husband's death."); *State v. Tapio*, 459 N.W.2d 406, 414 (S.D.1990) ("Vera's words and conduct clearly invited police officers to enter her home and investigate."); *State v. Sabbot*, 16 Wash.App. 929, 561 P.2d 212, 216 (1977) ("[A] police officer needs *no warrant if* he is in the house with the express or implied invitation of the accused, or with his acquiescence, tacit or express."); *Kelly v. State*, 75 Wis.2d 303, 249 N.W.2d 800, 805 (1977) ("Under such circumstances there was an implied consent not only to aid the victim but to determine what had caused the death injury and who was responsible.").

■ In accordance with the foregoing authority, we hold that consent to search may be implied by the circumstances surrounding

the search, by the person's prior actions or agreements, or by the person's failure to object to the search. Thus, a search may be lawful even if the person giving consent does not recite the talismanic phrase: "You have my permission to search."

■ The implied consent exception is undoubtedly a rational and practical rule to be applied when the police are summoned by the owner or occupier of a dwelling and told that a crime has occurred in his/her dwelling. Indeed, " '[o]ne can hardly expect the police to get a search warrant for a house or building when the owner is obviously cooperative and gives every appearance of being the victim, rather than the perpetrator, of a crime.' " *State v. Koedatich*, 112 N.J. 225, 548 A.2d 939, 958 (1988) (quoting *Steigler v. State*, 277 A.2d 662, 667 (Del.1971)), *vacated in part on other grounds by Steigler v. Delaware*, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972). It was correctly observed in *Thompson v. State*, that

When the owner or occupant of the premises permits the police to make a search without a warrant at a time when the occupant is not even suspected of complicity in the crime, the police are lulled into a sense of security, and [therefore] the occupant [can]not later object if the search led to the discovery of evidence which ultimately resulted in his being charged with complicity in the crime.

384 N.W.2d 461, 463–464 (Minn.1986).[8]

The appellate court in *Brown v. Texas*, 856 S.W.2d 177 (Tex.Crim.App.1993), also addressed the issue of implied consent to search in the context of the police responding to a call for help from a homeowner. In

8. We realize that the emergency exception to the warrant requirement permits entry and a limited search. *See Michigan v. Tyler*, 436 U.S. 499, 509–510, 98 S.Ct. 1942, 1950–1951, 56 L.Ed.2d 486 (1978) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."). This Court adopted the emergency exception in *State v. Cecil*, 173 W.Va. 27, 311 S.E.2d 144 (1983), in which we held that the emergency doctrine permitted

[a] limited, warrantless search or entry of an area by police officers where (1) there is an immediate need for their assistance in the pro-

tection of human life, (2) the search or entry by the officers is motivated by an emergency, rather than by an intent to arrest or secure evidence, and (3) there is a reasonable connection between the emergency and the area in question.

173 W.Va. at 32, 311 S.E.2d at 149. In the instant case, the emergency exception was not relied upon by the trial judge. The scope of the search conducted by the police in this case, under the implied consent exception, was greater than what would be permitted under the emergency exception.

*Brown*, the defendant called the police and informed them that he had found his wife dead in their garage. The defendant also reported that his wife was robbed because her purse was missing. When the police arrived they spoke briefly with the defendant before placing him in a patrol car to calm down. The police then proceeded to search the home. At some point the police took the defendant to police headquarters for a formal statement. The defendant was not a suspect when he was taken to police headquarters. However, during the course of the interview with the defendant, the police suspected he committed the crime due to inconsistencies in his story. The defendant was read his *Miranda* rights and told that he was a suspect.

The defendant in *Brown* was eventually tried and convicted of murdering his wife. One of the issues the defendant raised on appeal was that certain evidence admitted at trial should have been suppressed, because it was obtained from his home without a search warrant or consent. The appellate court noted that the "search of the home was without warrant or the expressed consent of [the defendant]. In fact, no officers ever approached [the defendant] about consent to search." *Brown*, 856 S.W.2d at 179. The opinion examined cases in other jurisdictions that had approved of upholding warrantless searches, based upon implied consent that was derived from conduct or actions by defendants. After reviewing those authorities, *Brown* found that in spite of the lack of a warrant or express consent, the search was lawfully made based upon the implied consent to search given by the conduct of the defendant. In affirming the conviction, the *Brown* opinion adopted the following guidelines for the implied consent exception to the warrant requirement:

> We will now adopt the reasoning employed by our sister States. We therefore hold that when a crime is reported to the police by an individual who owns or controls the premises to which the police are summoned, and that individual either states or suggests that it was committed by a third person, he or she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the

perpetrator. As long as the individual is not a suspect in the case or does nothing to revoke his consent, the police may search the premises for these purposes, and evidence obtained thereby is admissible. This implied consent is valid only for the initial investigation conducted at the scene and does not carry over to future visits to the scene.

*Brown*, 856 S.W.2d at 182. *Accord State v. Fleischman*, 157 Ariz. 11, 754 P.2d 340, 344 (App.1988).

Mr. Flippo suggests that the decision in *Thompson v. Louisiana*, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984), bars application of the implied consent exception to his case, because the trial court found that he had a lower expectation of privacy when he summoned the police. We do not believe *Thompson* prohibits application of the implied consent exception to this case.

In *Thompson* the defendant shot her husband and attempted suicide by taking an overdose of drugs. However, the defendant changed her mind about wanting to die and called her daughter for help. The defendant's daughter summoned the police to the defendant's house, and told the police that the defendant had shot her husband and then attempted suicide. The police found the defendant unconscious and had her taken to a hospital. About thirty-five minutes later, homicide detectives arrived at the scene and conducted a two-hour warrantless search of every room in the house. The defendant made a pretrial motion to suppress all evidence obtained during the search. After initially denying the motion, the trial court subsequently granted it in part. On appeal by the prosecutor, the state supreme court ruled that all evidence was admissible, in part, because the defendant had a lower expectation of privacy when she called her daughter for help. The United States Supreme Court disagreed.

In its decision in *Thompson*, the United States Supreme Court reasoned that the defendant's call to her daughter for assistance, which resulted in the daughter's call to the police, did not serve to diminish the defen-

dant's expectation of privacy.[9] However, *Thompson* limited the issue of diminished expectation of privacy to evidence that was not in plain view when the police arrived. *Thompson* also found that a diminished expectation of privacy may exist when the police reasonably believe a person is in need of immediate help, and they make a search for other victims or a suspect.

■ As Mr. Flippo correctly notes, *Thompson* clearly holds that when a third party summons help at the dwelling of another who is injured, the injured party's expectation of privacy is not lowered because of the rendition of assistance. However, this holding in *Thompson* has no application to the implied consent exception under the facts of this case, for four reasons. First, the United States Supreme Court expressly declined to address the general issue of consent in *Thompson*, because the State courts had not addressed that specific issue. Second, *Thompson* is factually distinguishable insofar as the defendant in that case did not make an emergency call for help to authorities. Here, Mr. Flippo did, in fact, make a 911 call for emergency assistance. Third, when the police arrived at the crime scene in *Thompson*, they knew that the defendant had killed her husband. In the instant case, the police initially viewed Mr. Flippo as a victim of a crime. Fourth, it would be illogical to conclude that a person's implied consent to search does not lower his/her expectation of privacy. The very essence of the implied consent to search exception, like the express consent exception, is the voluntary diminution of a person's expectation of privacy. That is, implied consent given by a person who summons the police for help means that the person relinquishes his/her constitutionally protected right to privacy, to the extent necessary for the police to effectively respond to facts presented by the call for help. *See State v. Pearson–Anderson*, 136 Idaho 847, 41 P.3d 275, 279 (App.2002) ("[W]e cannot ignore the fact that by making the 911 call, Pearson–Anderson herself diminished her reasonable expectation of privacy within her home by summoning police officers to the premises with an implied representation that an emergency was occurring."). To adopt the line of reasoning now postured by Mr. Flippo, would render the implied consent exception a hollow and unenforceable exception to the warrant requirement.[10] *Thompson* did not so hold, nor will we. *See Alford*

9. The case was reversed and remanded.

10. We also note that the decision in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), does not preclude application of the implied consent exception to a search warrant. *Mincey* involved a police drug raid at the defendant's apartment. The police forced their way into the apartment and a gun battle ensued. One police officer was killed. After the police arrested the defendant, a four day warrantless search of the defendant's apartment took place. Eventually the defendant was prosecuted and convicted of murder and other charges. On appeal the defendant argued that evidence seized during the four day search should have been suppressed. The Arizona supreme court disagreed and found that a warrantless search of a homicide scene was constitutionally permitted. The United States Supreme Court disagreed.

*Mincey* held that there is no murder scene exception to the Fourth Amendment warrant requirement. The opinion noted that when the police come upon a homicide scene, they may make a warrantless search of the area for victims or suspects, and may seize evidence that is in plain view. However, it was said that "a four-day search that included opening dresser drawers and ripping up carpets can hardly be rationalized in terms of the legitimate concerns that justify an emergency search." *Mincey*, 437 U.S. at 393, 98 S.Ct. at 2414. *See also Ladd*, 210 W.Va. at 433, 557 S.E.2d at 840 ("There is no 'murder scene' exception to the Fourth Amendment.") (citations omitted). The holding in *Mincey* does not preclude application of an implied consent exception to the Fourth Amendment. The issue of implied consent was not relevant to the case. In *Mincey*, there was no question that the police did not have express or implied consent to search. The police forced their way into the residence. Moreover, the police were not responding to an emergency call by the occupant of the apartment. In the case *sub judice*, the police entered Mr. Flippo's cabin after he called for police assistance and reported that he and his wife were attacked by an intruder. Consequently, *Mincey* is not controlling on the issue of implied consent to search. *See State v. Fleischman*, 157 Ariz. 11, 754 P.2d 340 (App.1988) (finding implied consent after distinguishing *Mincey*); *Alford v. State*, 291 Ark. 243, 724 S.W.2d 151 (1987) (same); *People v. Justin*, 140 Cal.App.3d 729, 189 Cal.Rptr. 662 (1983) (same); *State v. Brady*, 585 So.2d 524 (La.1991) (same); *Thompson v. State*, 384 N.W.2d 461 (Minn.1986) (same); *Brown v. Texas*, 856 S.W.2d 177 (Tex. Crim.App.1993) (same).

v. State, 291 Ark. 243, 724 S.W.2d 151, 153 (1987) (finding implied consent and distinguishing Thompson); Brown, 856 S.W.2d at 180 (same); McNair v. Commonwealth, 31 Va.App. 76, 521 S.E.2d 303, 307 (1999) (same).

 Based upon the foregoing authorities, we have little hesitancy in concluding that the implied consent exception to the warrant requirement, when properly invoked, does not offend federal or state constitutional guarantees against unreasonable searches and seizures. Therefore, we hold that when a person summons the police to a dwelling he/she owns, possesses, or controls, and that person states that a crime was committed against him/her or others by a third person at the premises, he/she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the perpetrator, absent a contrary limitation imposed by the person summoning the police.[11] As long as the person summoning the police is not a suspect in the case or does not affirmatively revoke his/her implied consent, the police may search the premises without a warrant for the purposes of investigating the reported offense and identifying the perpetrator, and evidence obtained thereby is admissible. If the person affirmatively revokes his/her implied consent or becomes a suspect during the investigation, the police must stop the search and obtain a warrant for the purpose of continuing the search. The implied consent exception is valid only for the initial investigation conducted at the scene, and does not extend to future visits to the scene.[12]

 Applying the above principles to the facts in the instant case clearly establishes that the police had implied consent to search the cabin during their initial response to Mr. Flippo's call for help. The record shows that at around 2:30 a.m. on the morning of April 30, 1996, Mr. Flippo made an emergency 911 telephone call to report that an intruder entered a cabin he rented and assaulted him and his wife. The following exchange occurred between Mr. Flippo and the 911 operator:

911 Operator: May I help you?

Mr. Flippo: I need help bad.

911 Operator: What's wrong?

Mr. Flippo: I'm hurt bad and my wife's hurt bad.

911 Operator: Did you wreck?

Mr. Flippo: No. I'm in my cabin and somebody hurt me.

911 Operator: Somebody hurt you in your cabin?

Mr. Flippo: Yes. And my wife won't wake up and I don't know what to do.

. . . .

911 Operator: Calm down. Okay? I need to know exactly where you're at to send an ambulance. Okay?

Mr. Flippo: I'm in the road up here. I'm at—I'm at a place that says, "Office." Office. I see an office sign.

. . . .

11. We do not believe it is wise to set out exact parameters for the scope of an implied consent search. See State v. Fleischman, 157 Ariz. 11, 754 P.2d 340, 344 (App.1988) (discussing scope of implied consent search); People v. Rodgers, 96 Ill.App.3d 416, 51 Ill.Dec. 695, 421 N.E.2d 203, 205 (1981) (same). Rather, this issue must be resolved based upon all the facts in a particular case. See United States v. Wesela, 223 F.3d 656, 661 (7th Cir.2000) ("To determine whether a search was within the boundaries of consent is determined according to the 'totality of all the circumstances.'" Quoting United States v. Torres, 32 F.3d 225, 230–31 (7th Cir.1994)). Our resolution of the matter presently before this Court does not require us to determine whether the police exceeded the reasonable scope of implied consent. See Cupp v. Murphy, 412 U.S. 291, 295, 93 S.Ct. 2000, 2003, 36 L.Ed.2d 900 (1973) ("[T]he scope of the warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement.").

12. It is not practical to attempt to establish a bright line as to when an initial investigation ends and a subsequent investigation begins. This issue must be determined on a case-by-case basis when it is relevant. In the case sub judice, our resolution of the lawfulness of the seizure of the photographs, does not require that we determine whether the photographs were seized during the initial investigation or a subsequent investigation.

911 Operator: I need to know exactly how did you get hurt, honey? I need you to calm down and tell me this.

Mr. Flippo: He hit me with a log.

911 Operator: Somebody hit you with a log?

Mr. Flippo: Yes.

911 Operator: Hold on.

Mr. Flippo: I think they cut me, too.

. . . .

911 Operator: We're dispatching the police and I've got an ambulance enroute. Okay?

Mr. Flippo: Okay. I'll watch for them.

. . . .

911 Operator: . . . Where is your wife at? Do you know exactly where she's at?

Mr. Flippo: She's at my cabin.

911 Operator: Okay. What cabin are you in? Do you know?

Mr. Flippo: 13. 13. I'm at the—I'm at the office.

911 Operator: Okay. You're at the office. But is your wife in Cabin 13?

Mr. Flippo: Yes.

. . . .

Mr. Flippo: Is somebody coming to help me?

911 Operator: Yes, honey. I've got two ambulances coming and I've got a police officer coming. Okay?

Mr. Flippo: Okay.

911 Operator: I want you to stay on the line with me until they get there, though can you hold on for a minute?

Mr. Flippo: Okay.

At about 2:40 a.m., Deputy Bryant arrived at the park and found Mr. Flippo near a telephone booth. During the trial, Deputy Bryant gave the following account of what transpired when he initially arrived: [13]

Prosecutor: And when you got the call, what was the information that was relayed to you that caused you to go to Babcock?

Deputy Bryant: The original information was kind of confused. It was an individual had been assaulted or something of that matter, and they was unsure how many individuals that was there. . . .

. . . .

Prosecutor: And tell us what you observed when you pulled onto the—pulled into Babcock?

Deputy Bryant: . . . When I arrived, an individual was sitting in a chair talking on the telephone. He was dressed only in white underwear. . . .

. . . .

Prosecutor: All right. The—did you—at that time did you note any injuries or anything unusual about this person you saw on the steps there?

Deputy Bryant: I seen no visible injuries of the subject, on himself. His underwear was torn on the right-hand side, and he appeared to have blood on the material, and also it looked like a red substance, which I thought was blood, on his right leg.

Prosecutor: Okay. Tell us what conversation you had with him there at the office.

Deputy Bryant: When I originally approached the individual, he said, "please don't hurt me. Don't hurt me." I advised him who I was, told him that I was not going to hurt him. . . .

Prosecutor: All right. And then did—tell us what happened then.

Deputy Bryant: The individual then got in the vehicle with me. I placed him in the front seat next to me. I asked him what his name was. He advised me. I asked him different questions, trying to get him to calm down a little bit, because he was a little bit hysterical, trying to find out exactly what type of situation I was going into, because I still wasn't aware.

I asked him if his—how old his wife was, just different questions, trying to get him to calm down, what type of vehicle he had arrived in, and just general questions.

. . . .

Prosecutor: You asked him about his vehicle. Did he advise you as to what kind of vehicle he had?

13. Deputy Bryant did not testify at the suppression hearing.

Deputy Bryant: He advised me that it was a green Cadillac that he was driving that evening.

Prosecutor: Did he indicate it was still there, or that it was missing?

Deputy Bryant: He told me that the vehicle had been stolen from him. At that time I advised other officers to start looking for this vehicle on Route 60 and Route 41.

. . . .

Prosecutor: Where did—where did Mr. Flippo direct you to go that morning?

Deputy Bryant: He advised me that he was staying in Cabin No. 13. It was down from the grist mill, the old mill that sits there along the stream in Babcock.

. . . .

Prosecutor: Tell us what you did when you arrived there on the scene?

Deputy Bryant: When I arrived at the scene, I asked Mr. Flippo if that was the cabin he was staying at. He responded it was.

I asked Mr. Flippo to remain seated in my vehicle while I went down and checked on the welfare of the female that was still—supposed to still be inside the cabin.

. . . .

Prosecutor: All right. Go ahead and tell us what you did once you entered the cabin.

Deputy Bryant: . . . I looked around, made sure no one was around that bed hiding from me. I then looked down on the main floor, using my flashlight, and that's when I observed the body of a female up against the wall on the back side of the bed.

. . . .

Prosecutor: What did you then do?

Deputy Bryant: I then came back down the stairway, again looking to make sure

there was no one else in the residence there except for her, exited, went back out. As I started back up the steps, Mr. Flippo met me. He was coming down the steps. He asked me at that time, said, "Did she wake up?" I advised him, no, she did not. I got him by his arm and took him back up to my cruiser, put him back in my cruiser and asked him to stay in the vehicle. About that time paramedics arrived on the scene.

The conversation Mr. Flippo had with the 911 operator and the uncontradicted testimony of Deputy Bryant, establish that Mr. Flippo led authorities to believe that he and his wife were victims of an assault by a third party at their cabin and that someone had stolen their vehicle. Deputy Bryant's testimony established that he viewed Mr. Flippo initially as the victim of an assault and auto-theft. Deputy Bryant allowed Mr. Flippo to ride in the front seat of the patrol car, and alerted other officers to be on the lookout for Mr. Flippo's stolen car.

 The record is clear in showing that when Deputy Bryant went into the cabin he had no search warrant. Also, there was no evidence that Mr. Flippo expressly consented to the deputy going inside the cabin. Nor was there any evidence that Mr. Flippo expressly prohibited the deputy from entering the cabin. In viewing all the evidence surrounding Deputy Bryant's entry into the cabin, we are compelled to conclude that Mr. Flippo impliedly consented to the entry and search of the cabin.[14] We further find that from the totality of all the circumstances, Mr. Flippo's implied consent was voluntary and not the product of duress or coercion by Deputy Bryant.

 **2. Revoking implied consent to search.** Our analysis does not end after having determined that the police had implied consent from Mr. Flippo to enter and search the cabin. Next, we must determine

14. We are not concerned that the implied consent was given to Deputy Bryant, but that other officers later responded to the scene. As stated by another court, "[w]e know of no decision and no logical basis for holding that a lawful entry is limited to a single officer, nor any rule that prohibits one officer, legitimately on the premises, from being joined by a sufficient number of his fellow officers, or his superior officers, to take charge and to perform the police functions which are then immediately justified and required." *Wooten v. State,* 398 So.2d 963, 967 (Fla.App.1981).

whether the photographs were lawfully seized. Mr. Flippo contends that, even if he initially gave implied consent to enter and search the cabin, he expressly revoked that consent when he invoked his right to legal counsel. We need not determine whether Mr. Flippo's request for counsel revoked his implied consent to search the cabin. *See United States v. Akins*, 995 F.Supp. 797, 807 (M.D.Tenn.1998) ("Akins invoked his Fifth Amendment right to counsel by stating that he would refuse to answer any more questions without the presence of his attorney. At that point, Akins effectively withdrew his consent to speak with the officers, and by extension, his consent to be searched. Any further intrusion into his person or property thus has to be justified independently."). In view of the guidelines we have adopted for the implied consent exception, we find that the revocation of Mr. Flippo's implied consent occurred when the police first concluded that he was a suspect in the death of his wife. To thoroughly address this issue requires a time line of relevant events.

Shortly after the paramedics arrived at the cabin, Mr. Flippo was taken to a local hospital. Mr. Flippo arrived at the hospital around 3:45 a.m. There was no evidence that Mr. Flippo requested the police stop searching inside the cabin before he was transported to the hospital. Mr. Flippo remained at the hospital for several hours before being released and taken to police headquarters to give a statement.

Around 7:26 a.m., Mr. Flippo arrived at police headquarters to give a formal statement of what occurred at the cabin. At approximately 10:33 a.m., the police informed Mr. Flippo that he was a suspect.[15] At this point in time, under our holding, the police were required to stop searching the cabin and obtain a search warrant. Unfortunately, the record indicates that the police continued their search without a warrant after concluding that Mr. Flippo was a suspect. The search continued until around 9:43 p.m. The United States Supreme Court has made crystal clear that "a warrantless search must be 'strictly circumscribed by the [circumstances] which justify its initiation[.]' " *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (quoting *Terry v. Ohio*, 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968)). That is, there is "no reason why, simply because some interference with an individual's privacy ... has lawfully taken place, further intrusions should automatically be allowed despite the absence of a warrant that the Fourth Amendment would otherwise require." *Chimel v. California*, 395 U.S. 752, 766 n. 12, 89 S.Ct. 2034, 2042 n. 12, 23 L.Ed.2d 685 (1969). Under this standard, we are precluded from placing the burden on Mr. Flippo to have expressly informed the police that there was no longer an implied consent to search the cabin once he was advised that he had become a suspect in the death of his wife. This is a burden that the State must acknowledge and undertake by sua sponte terminating the search and seeking a search warrant.[16]

■ While we have concluded that Mr. Flippo's implied consent to search was revoked at approximately 10:33 a.m., the record is less clear as to exactly when the police discovered the photographs. Obviously, "[n]o claim can be made that items seized in the course of a consent search ... must be [suppressed] when consent is revoked. Such a rule would lead to the implausible result that incriminating evidence seized in the course of a consent search could be retrieved by a revocation of consent." *Jones v. Berry*, 722 F.2d 443, 449 n. 9 (9th Cir.1983). *See United States v. Grissom*, 825 F.Supp. 949, 953 (D.Kan.1993) ("The court concludes further that if defendant later revoked that consent ... that that revocation was too late

---

**15.** The police read Mr. Flippo his *Miranda* rights. Approximately 25 minutes later he invoked his right to counsel.

**16.** We find this burden to be analogous to the burden the State has of stopping an interrogation of a suspect when he/she requests counsel, even though the suspect never expressly states that he/she no longer wishes to talk. *See Minnick v.*

*Mississippi*, 498 U.S. 146, 147, 111 S.Ct. 486, 488, 112 L.Ed.2d 489 (1990) ("[T]he police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel." Citing *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966)).

in that it occurred after the agents had already seized the stolen items.").

Mr. Flippo contends that the photographs were seized at 7:44 p.m., roughly nine hours after he was informed that he was a suspect.[17] The State contends that the photographs were seized at or before 12:04 p.m., less than two hours after Mr. Flippo was informed that he was a suspect. In "reviewing the record in the light most favorable to the prosecution," State v. Guthrie, 194 W.Va. 657, 667, 461 S.E.2d 163, 173 (1995), we will examine the issue of when the State seized the photographs, based upon the State's assertion that the seizure occurred at or before 12:04 p.m.

At some point after Mr. Flippo was informed that he was a suspect, he requested medication and clothing that were at the cabin. Based upon the investigative log notes of Detective Burke, who was at the crime scene, some medication was found in the briefcase at around 12.04 p.m. The medication and clothing were taken to Mr. Flippo at police headquarters. The State takes the position that, assuming Mr. Flippo's implied consent to search was revoked, he later expressly consented to the cabin being searched for clothing and medication. We do not disagree with the State that subsequent to the revocation of Mr. Flippo's implied consent, he granted express consent to search the cabin for his medication and clothing. We also agree with the State that Detective Burke's log entry indicates that at or · before 12:04 medication was retrieved from the briefcase. However, we disagree with the State that it has carried its burden of showing that the photographs were seized, either during the implied consent search or during the limited express consent search.

Although Detective Burke composed a detailed 33 page log entry setting out the time in which evidence was seized or located, the log entry failed to show specifically when the police seized or located the photographs. We cannot presume that the photographs were uncovered during the search for medication or prior to the time Mr. Flippo was viewed as a suspect. Such a presumption would distill the State's burden to "prove by a preponderance of evidence that the [seizure] was legal." Syllabus, in part, State v. Hacker, 158 W.Va. 182, 209 S.E.2d 569 (1974). Consequently, we find that the trial court erroneously held that the photographs were admissible under the implied consent exception to the warrant requirement.[18]

### B. Inevitable Discovery Rule

As an alternative basis for admitting the photographs depicting Mr. Boggess undressing, the circuit court held that the "photographs were clearly admissible under the ultimate or inevitable discovery exception to the exclusionary rule." Mr. Flippo contends that the inevitable discovery rule was not applicable.[19] For the following reasons, we agree with Mr. Flippo.

The inevitable discovery rule was first recognized by this Court in syllabus

---

17. Mr. Flippo based his seizure time on the log entry of Detective Burke, which indicated that the briefcase was given an identification number at 7:44 p.m. This log entry does not disclose anything about when the photographs were seized.

18. The photographs were contained in two envelopes inside the briefcase. There is no contention that the plain view doctrine permitted the seizure. See Syl. pt. 3, State v. Julius, 185 W.Va. 422, 408 S.E.2d 1 (1991) ("The essential predicates of a plain view warrantless seizure are (1) that the officer did not violate the Fourth Amendment in arriving at the place from which the incriminating evidence could be viewed; (2) that the item was in plain view and its incriminating character was also immediately apparent; and (3) that not only was the officer lawfully located in a place from which the object could be plainly

seen, but the officer also had a lawful right of access to the object itself."). See also, Horton v. California, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990).

19. Neither the circuit court, nor the State have contended that the "independent source rule" is applicable to the facts of this case. See Ladd, 210 W.Va. at 433, 557 S.E.2d at 840 ("[T]he independent source rule is generally utilized to preserve the admissibility of evidence seized pursuant to a search warrant when it is alleged that the probable cause supporting the warrant was based on information acquired during a previous illegal search."); Syl. pt. 4, State v. Aldridge, 172 W.Va. 218, 304 S.E.2d 671 (1983) ("The exclusionary rule has no application when the State learns from an independent source about the evidence sought to be suppressed.").

point 2 of *State v. Hawkins*, 167 W.Va. 473, 280 S.E.2d 222 (1981), wherein we held:

> There are three generally recognized exceptions to the exclusionary rule: (1) where evidence sought to be introduced has an independent source, (2) where the evidence would inevitably have been discovered, and (3) where the connection between unconstitutional police conduct and the discovery of the evidence is so attenuated as to remove any taint of the original illegality.

More specifically, we have previously recognized, and now hold that under the inevitable discovery rule, unlawfully obtained evidence is not subject to the exclusionary rule [20] if it is shown "that the evidence would have been discovered pursuant to a properly executed search warrant." *State v. Ladd*, 210 W.Va. 413, 434, 557 S.E.2d 820, 841 (2001).[21]

■ Although the inevitable discovery rule has been a part of West Virginia jurisprudence for over 20 years, there has been only one occasion that we have been called upon to determine whether the rule actually applied under a given set of facts. *See State v. Hlavacek*, 185 W.Va. 371, 379, 407 S.E.2d 375, 383 (1991) (inevitable discovery rule did not justify seizure of drugs). *See also, Ladd*, 210 W.Va. at 434, 557 S.E.2d at 841 (remanding inevitable discovery rule issue to trial court). As a result of the limited opportunity we have had to examine the inevitable discovery rule, we have not developed any guidelines for the application of the rule. We will take this opportunity to do so.[22]

It has been suggested that "[i]n carving out the 'inevitable discovery' exception ... courts must use a surgeon's scalpel and not a meat axe." 5 Wayne R. LaFave, *Search and Seizure*, § 11.4(a), p. 244 (1996). A review of judicial opinions reveal that federal and state courts have used a "scalpel" and a "meat axe" in carving out guidelines for the inevitable discovery rule. That is, there is a split of authority among federal and state courts on the requirements for establishing the inevitable discovery rule.[23]

**20.** "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347, 107 S.Ct. 1160, 1165, 94 L.Ed.2d 364 (1987). *See Illinois v. Rodriguez*, 497 U.S. 177, 183, 110 S.Ct. 2793, 2799, 111 L.Ed.2d 148 (1990) (Under the exclusionary rule "no evidence seized in violation of the Fourth Amendment [can] be introduced at [a defendant's] trial unless he consents.").

**21.** Subsequent to our decision in *Hawkins*, the United States Supreme Court approved of the inevitable discovery rule in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). *Nix* held that when evidence "would inevitably have been discovered without reference to the police error or misconduct ... the evidence is admissible." *Nix*, 467 U.S. at 448, 104 S.Ct. at 2511.

**22.** We note at the outset that, for the purposes of analysis, courts have made a distinction between the type of evidence sought to be admitted under the inevitable discovery rule. The evidence may either be "secondary" (also called "derivative") or "primary." Secondary evidence is usually seized as a result of the police unlawfully questioning a suspect and the suspect informs the police where the evidence is located. In this situation, the police may not actually need a search warrant to obtain the evidence from its location. Consequently, the unlawful conduct would be in questioning the suspect, not the actual seizure of the evidence. Primary evidence is evidence that is actually seized from a location that required a search warrant for the evidence to be seized. In this situation no unlawful conduct led the police to the location of the evidence. Courts generally apply the inevitable discovery rule to both types of evidence. *See People v. Burola*, 848 P.2d 958, 961 (Colo.1993) ("While the inevitable discovery exception has been applied most frequently to secondary evidence, there is no logical reason not to apply the exception to primary evidence."). *But see, People v. James*, 256 A.D.2d 1149, 684 N.Y.S.2d 112, 113 (1998) ("[T]he inevitable [discovery] exception applies only to secondary evidence and does not justify admission of the very evidence that was obtained as the immediate consequence of the illegal police conduct."). We have discerned no constitutional reason against applying the inevitable discovery rule to both types of evidence. In the instant case, the photographs seized are primary evidence because they were not obtained as a result of any unlawful questioning of Mr. Flippo.

**23.** Only two jurisdictions appear to have expressly refused to recognize the inevitable discovery rule. *See Ammons v. State*, 770 N.E.2d 927, 935 (Ind.Ct.App.2002); *Henderson v. State*, 82 S.W.3d 750, 753 (Tex.Ct.App.2002). Additionally, we have found only three states, South Carolina, Vermont, and Wyoming, that appear never to have directly addressed the issue of the inevitable discovery rule.

A minority of federal and state courts take the position that the parameters of the inevitable discovery rule should not be so broad as to legitimize an unlawful seizure of evidence, merely because the police subsequently obtained, or could have obtained, a search warrant that would have led to the ultimate seizure of that evidence. *See United States v. Conner*, 127 F.3d 663, 667 (8th Cir.1997); *United States v. Cabassa*, 62 F.3d 470, 473 (2d Cir.1995); *United States v. Six Hundred Thirty–Nine Thousand Five Hundred and Fifty–Eight Dollars*, 955 F.2d 712, 720–721 (D.C.Cir.1992); *United States v. Lamas*, 930 F.2d 1099, 1101 (5th Cir.1991); *United States v. Terzado–Madruga*, 897 F.2d 1099, 1114 (11th Cir.1990); *People v. Diaz*, 53 P.3d 1171, 1176 (Colo.2002); *State v. Anderson*, 67 Conn.App. 436, 787 A.2d 601, 606 (2001); *State v. Harris*, 642 A.2d 1242, 1251 (Del. 1993); *Taylor v. State*, 274 Ga. 269, 553 S.E.2d 598, 604 (2001); *People v. Perez*, 258 Ill.App.3d 133, 196 Ill.Dec. 461, 630 N.E.2d 158, 162 (1994); *In Interest of J.D.F.*, 553 N.W.2d 585, 590–591 (Iowa 1996); *State v. McKessor*, 246 Kan. 1, 785 P.2d 1332, 1337 (1990); *State v. Hatton*, 389 N.W.2d 229, 234 (Minn.Ct.App.1986); *White v. State*, 735 So.2d 221, 223 (Miss.1999); *State v. Lashley*, 353 N.J.Super. 405, 803 A.2d 139, 142 (2002); *State v. Romero*, 130 N.M. 579, 28 P.3d 1120, 1122 (Ct.App.2001); *Harjo v. State*, 882 P.2d 1067, 1073 (Okla.Crim.App.1994); *Commonwealth v. Wideman*, 478 Pa. 102, 385 A.2d 1334, 1336 (1978); *State v. Trepanier*, 600 A.2d 1311, 1319 (R.I.1991); *State v. Boll*, 651 N.W.2d 710, 716 (S.D.2002); *Wilkins v. Commonwealth*, 37 Va.App. 465, 559 S.E.2d 395, 400 (2002); *State v. Lopez*, 207 Wis.2d 413, 559 N.W.2d 264, 269 (App.1996). This point was addressed in *United States v. Satterfield*, 743 F.2d 827 (11th Cir.1984), wherein the Eleventh Circuit stated:

> The Government cannot later initiate a lawful avenue of obtaining the evidence and then claim that it should be admitted because its discovery was inevitable.... [A] valid search warrant nearly always can be obtained after the search has occurred, a contrary holding would practically destroy the requirement that a warrant for the search of a home be obtained before the search takes place.

*Satterfield*, 743 F.2d at 846. The minority of courts that follow *Satterfield's* narrow scope for the inevitable discovery rule utilize the following test for establishing the rule:

> To succeed under the inevitable-discovery exception to the exclusionary rule, the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.[24]

*United States v. Conner*, 127 F.3d 663, 667 (8th Cir.1997). Thus, under the minority view, the police must have been attempting other lawful means of acquiring the evidence at the time they engaged in conduct that led to the unlawful seizure of the evidence.

A majority of federal and state courts apply a broad scope for the inevitable discovery rule, by not requiring the police to have initiated lawful means to acquire evidence prior to its seizure. *See United States v. Scott*, 270 F.3d 30, 42–43 (1st Cir.2001); *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir.2000); *United States v. Ford*, 184 F.3d 566, 577 (6th Cir.1999); *United States v. Allen*, 159 F.3d 832, 841 (4th Cir.1998); *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir.1998); *United States v. Larsen*, 127 F.3d 984, 987 (10th Cir.1997); *United States v. Gravens*, 129 F.3d 974, 979–980 (7th Cir.1997); *Jones v. State*, 615 So.2d 1293, 1295 (Ala.Crim.App.1993); *Smith v. State*, 992 P.2d 605, 608 (Alaska Ct.App. 1999); *Miller v. State*, 342 Ark. 213, 27 S.W.3d 427, 432 (2000); *State v. Paxton*, 186 Ariz. 580, 925 P.2d 721, 725 (Ct.App.1996);

---

**24.** For a slightly different version of the test see *Walls v. Commonwealth*, 2 Va.App. 639, 347 S.E.2d 175, 185 (1986) ("[A]pplication of the inevitable discovery exception requires that the prosecution show: (1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct, (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternative line of investigation.").

*People v. Carpenter*, 21 Cal.4th 1016, 90 Cal. Rptr.2d 607, 623, 988 P.2d 531 (2000); *Craig v. State*, 510 So.2d 857, 862–63 (Fla.1987); *State v. Lopez*, 78 Hawai'i 433, 896 P.2d 889, 907 (1995); *State v. Cook*, 106 Idaho 209, 677 P.2d 522, 530 (App.1984); *Hughes v. Commonwealth*, 87 S.W.3d 850 (Ky.2002); *State v. Clark*, 499 So.2d 332, 336 (La.Ct.App. 1986); *Commonwealth v. Balicki*, 436 Mass. 1, 762 N.E.2d 290, 303 (2002); *State v. St. Yves*, 751 A.2d 1018, 1023 (Me.2000); *Oken v. State*, 327 Md. 628, 612 A.2d 258, 271 (1992); *People v. Brzezinski*, 243 Mich.App. 431, 622 N.W.2d 528, 532 (2001); *State v. Jackson*, 756 S.W.2d 620, 622 (Mo.Ct.App.1988); *State v. Soukharith*, 253 Neb. 310, 570 N.W.2d 344, 358 (1997); *Proferes v. State*, 116 Nev. 1136, 13 P.3d 955, 958 (2000); *State v. Holler*, 123 N.H. 195, 459 A.2d 1143, 1146 (1983); *People v. Turriago*, 90 N.Y.2d 77, 659 N.Y.S.2d 183, 188, 681 N.E.2d 350 (1997); *State v. Garner*, 331 N.C. 491, 417 S.E.2d 502, 508 (1992); *State v. Johnson*, 531 N.W.2d 275, 280 (N.D. 1995); *State v. Perkins*, 18 Ohio St.3d 193, 480 N.E.2d 763, 766–767 (1985); *State v. Walker*, 181 Or.App. 548, 47 P.3d 65, 68 (2002); *State v. Coury*, 657 S.W.2d 777, 780 (Tenn.Cr.App.1983); *State v. Topanotes*, 14 P.3d 695, 697 (Utah Ct.App.2000); *State v. Thompson*, 112 Wash.App. 787, 51 P.3d 143, 151 (2002). These courts hold that "[i]t is the government's burden to show that the evidence at issue would have been acquired through lawful means, a burden that can be met if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence." *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir.1998). This majority view of the rule does not "limit the inevitable discovery exception to lines of investigation that were already underway." *United States v. Larsen*, 127 F.3d 984, 987 (10th Cir.1997). Under the majority view, so long as the police "could have" used lawful means to seize the evidence, the inevitable discovery rule will permit the evidence to be admitted into evidence.

█ In the instant case, the State argues that this Court should adopt the majority view of the inevitable discovery rule. Mr. Flippo urges this Court to adopt the minority view of the rule. We believe that the minority view is consistent with the stringent warrant requirement under Article III, Section 6 of our constitution.[25] In adopting the minority view, we do so with a practical realization that "[i]f police are allowed to search when they possess no lawful means and are only required to show that lawful means could have been available even though not pursued, the narrow 'inevitable discovery' exception would 'swallow' the [constitutional warrant] protection." *State v. Hatton*, 389 N.W.2d 229, 234 (Minn.Ct.App.1986). This we will not permit. Therefore, we hold that to prevail under the inevitable discovery exception to the exclusionary rule, Article III, Section 6 of the West Virginia Constitution requires the State to prove by a preponderance of the evidence:[26] (1) that there was a reasonable

**25.** We hasten to point out that we do not address the issue of whether the Fourth Amendment of the federal constitution sustains the majority or minority view. The United States Supreme Court has not resolved the split of authority on this issue among federal appellate courts. We realize that the minority view is more stringent than the majority view, and that ultimately in a proper case the United States Supreme Court may find the minority view is not required by the Fourth Amendment. However, our State constitution will only permit the minority view to stand. We have previously recognized "that West Virginia is free to adopt protections of its own, so long as West Virginia does not diminish federal rights." *State v. Carrico*, 189 W.Va. 40, 44, 427 S.E.2d 474, 478 (1993). *Accord* Syl. pt. 2, *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979) ("The provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protection than afforded by the Federal Constitution."). *See also State v. Lashley*, 353 N.J.Super. 405, 803 A.2d 139, 142 (2002) ("If we were to uphold the denial of the motion to suppress in this case, the police could decide to enter a home without a warrant, ... whenever they believe they have probable cause to obtain a search warrant. This rationale is inconsistent with basic principles which flow from our Supreme Court's interpretation of N.J. Const. art. I, par. 7[.]").

**26.** The United States Supreme Court has approved of the preponderance of the evidence standard. *See Nix*, 467 U.S. at 444, 104 S.Ct. at 2509. However, state courts are split on the burden of proof imposed. Some courts use the preponderance of the evidence standard, while others require a showing of clear and convincing evidence. *See, e.g., Smith v. State*, 992 P.2d 605, 608 (Alaska Ct.App.1999) (clear and convincing); *State v. Rocco*, 255 Ga.App. 565, 566 S.E.2d 365,

probability that the evidence would have been discovered by lawful means in the absence of police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and (3) that the police were actively pursuing a lawful alternative line of investigation to seize the evidence prior to the time of the misconduct.

■ Applying this test to the facts of the instant case, it is clear that the inevitable discovery rule was not established by the State. In order for the State to have proven that the inevitable discovery rule applied, it had to show that immediately after it was determined that Mr. Flippo was a suspect, which revoked his implied consent to search,[27] the police initiated procedures to obtain a search warrant before the photographs were unlawfully seized.[28] The record does not disclose such facts. The record shows only that a few days after the crime occurred, the police obtained a search warrant for the purpose of having a medical examination performed on Mr. Flippo. Consequently, we find that the circuit court incorrectly concluded that the photographs were admissible under the inevitable discovery rule.

### C. Harmless Error Rule

We have determined that the photographs were unlawfully seized from Mr. Flippo's briefcase, and therefore should not have been introduced into evidence. The trial court's order concluded that, to the extent the photographs should not have been admitted into evidence, their admission was harmless error and the conviction should stand. Mr. Flippo contends that the error was not harmless. We disagree.

■ This Court has observed on numerous occasions that " '[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt.' Syl. pt. 5, *State ex rel. Grob v. Blair,* 158 W.Va. 647, 214 S.E.2d 330 (1975)." Syl. pt. 14, *State v. Salmons,* 203 W.Va. 561, 509 S.E.2d 842 (1998). The burden is upon "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Moreover, " '[e]rrors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable possibility that the violation contributed to the conviction.' " *State v. Jenkins,* 195 W.Va. 620, 629, 466 S.E.2d 471, 480 (1995) (quoting, Syl. pt. 20, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974)). Consequently, "[a]n error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless." *Chapman,* 386 U.S. at 23–24, 87 S.Ct. at 828.[29]

---

367 (2002) (preponderance); *State v. Lopez,* 78 Hawai'i 433, 896 P.2d 889, 907 (1995) (clear and convincing); *State v. Vigne,* 820 So.2d 533, 539 (La.2002) (preponderance); *Commonwealth. v. Balicki,* 436 Mass. 1, 762 N.E.2d 290, 303 (2002) (preponderance); *Proferes v. State,* 116 Nev. 1136, 13 P.3d 955, 958 (2000) (clear and convincing); *State v. James,* 346 N.J.Super. 441, 788 A.2d 334, 341 (2002) (clear and convincing); *State v. Thompson,* 112 Wash.App. 787, 51 P.3d 143, 151 (2002) (preponderance).

27. We previously pointed out in this opinion that the State failed to show the photographs were discovered during the period they had Mr. Flippo's implied consent to search, or during the limited express consent to search for medication and clothing.

28. To be clear, under our test the police did not actually have to possess the search warrant when they uncovered the photographs. The test we

have adopted only required the police have been actively seeking the search warrant before the discovery was made.

29. We also employ a heightened standard when reviewing the erroneous admission of evidence that is not linked to a constitutional violation. *See* Syl. pt. 2, *State v. Atkins,* 163 W.Va. 502, 261 S.E.2d 55 (1979) ("Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.").

582

In conducting our analysis as to whether or not the circuit courts error in admitting the photographs was harmless, we will first review the other evidence of Mr. Flippo's guilt to see if it provides a sufficient basis for finding Mr. Flippo guilty beyond a reasonable doubt. If the evidence meets this standard, we will then consider what impact, if any, the photographs had on the jury.

1. **Evidence of Guilt.** As we will systematically show, in this case "[t]he issue of guilt was not remotely close." *People v. Carpenter*, 21 Cal.4th 1016, 90 Cal.Rptr.2d 607, 624, 988 P.2d 531 (2000). The State presented overwhelming evidence to prove Mr. Flippo's guilt beyond a reasonable doubt.[30]

*(a) Planning.* The State presented evidence from which the jury could reasonably infer that the murder of Mrs. Flippo was planned by Mr. Flippo to take place at Babcock State Park in Cabin No. 13. During the trial the State called Pam Jewell, Mrs. Flippo's sister, who testified that after the murder of her sister, she telephoned Mr. Flippo and asked him to explain to her what happened.[31] The following testimony regarding Ms. Jewell's conversation with Mr. Flippo was given:

Q. Yes. Tell us—tell us what he told you.

A. He told us that they had decided to have a romantic rendezvous, that he picked up Cheryl and they went and borrowed a convertible from a friend who was going to sell it, but he was going to let him use it for a day. . . .

And he said they went for a drive, and they decided that it would be good to spend the night at Babcock State Park.

. . . .

Q. Did he indicate to you whether this was a planned—

A. He said it was spur of the moment, that they just decided to spend the night, and he said they went and got some stuff.

Although Mr. Flippo indicated to his sister-in-law that his and his wife's decision to stay at Babcock State Park was impromptu, other evidence presented by the State proved that the decision to stay at the park was not a spur of the moment event. The State called Joel Boggess to elicit testimony to show Mr. Flippo selected Cabin 13 as the site of the murder on the day he baptized Mr. Boggess:

Q. Either before or after your baptism, did you have occasion to go into the vicinity of Cabin 13?

A. Yes.

Q. Was it before or after?

A. I don't remember.

Q. What was the purpose in going to Cabin 13 on that particular Saturday?

A. We didn't go—we didn't go to the cabin. We drove by all of the cabins.

Q. And you didn't—you didn't point out Cabin 13, "This is where we"—"This is where I stayed before"?

A. Yes.

Q. You did do that?

A. Yeah.

The State also called Janice Faye Bostic, an employee at the park. Ms. Bostic testified as to when Mr. Flippo made reservations to stay at the park, as well as his specific selection of Cabin No. 13:

Q. All right. Tell us how you went about filling this particular document out, if you would.

A. Okay. He called me on the phone and said he wanted to have a cabin. This was on Saturday, the 27th. He said he wanted a cabin for that Monday night, which was on the 29th. And we had just about everything in the park available, and—

Q. How was No. 13 selected?

A. . . . I asked if there was a particular cabin he had in mind, and he said he would like—he asked me if Cabin No. 13 was available, and I said that it was . . .—he told me that he had two people. And so I

30. Mr. Flippo did not testify during the trial. He called three witnesses during his case-in-chief. Mr. Flippo's three witnesses were his adult sons, Chad Alton Flippo, Eric Brentz Flippo and James Michael Flippo, II. Mr. Flippo's three sons testi-

fied, essentially, that they did not know of any serious marital problems between their parents.

31. Ms. Jewell's brother was listening to the conversation on another telephone.

always—they usually tell me how many people they have, and I informed him that Cabin 13 was a three person. He said that was fine, no problem.

In addition, evidence was presented by the State to show that Cabin 13 was in an isolated area. The State called Richard Morris, the assistant superintendent of the park, who testified as to the isolation of Cabin 13:

Q. ... Are there other cabins down below Cabin 13?

A. No, sir, not on that side of the creek. No, sir.

Q. So that's the last cabin on that road.

A. The last cabin on that road, yes, sir.

Further evidence of the remote location of Cabin No. 13 was elicited from the testimony of Mr. Boggess:

Q. Have you ever stayed at Cabin 13?

A. Yes.

Q. How would you describe Cabin 13 as to whether it's unsecluded or secluded?

A. Pretty secluded.

*(b) Motive.* The State prosecuted this case on the theory that Mr. Flippo murdered his wife for money and because she disapproved of his relationship with Mr. Boggess.[32] The State presented sufficient evidence to establish both issues.[33]

As to the issue of financial motive, the State presented evidence to show that Mrs. Flippo greatly limited Mr. Flippo's access to family income. Mrs. Flippo's sister, Ms. Jewell, testified to this issue as follows:

Q. Tell us what problems Michael had in regards to finances.

A. Michael had a tendency to overspend. He was extravagant, would run—he just would run up debts and bills and credit cards, and then Cheryl would find out as the bills would come in, or the credit card payments would become due or whatever. And then eventually she took the credit cards away from him. She tore them all

up. She cut them up. I saw her. And she said, "no more credit cards."

Ms. Jewell also testified that the Flippos received about $80,000.00 from an automobile accident involving Mr. Flippo. Ms. Jewell stated that the money "was put into an account that required both their signatures in order for any money to be removed."

The State also presented evidence from Gayle Koone, a transport officer for the Fayette County Sheriff's Department. Mr. Koone testified to unsolicited statements made to him by Mr. Flippo as he transported him back to jail from a court appearance:

Q. And did you question him about anything—

A. No, sir.

Q. —on the trip back?

A. No, sir, I did not.

Q. Did he say or make any comments to you on the trip back to the facility?

A. He made a statement, that his lawyer had told him that he might have to sell one of his vehicles so he could have a little extra money.

Q. Have what?

A. A little extra money.

Q. All right. And did he say anything else?

A. He said that he told his lawyer that at the time he didn't think it would be necessary, that he could use cash he had on hand, that he was better off now financially than he had ever been.

Additional evidence of Mr. Flippo's financial motive was presented by the State through Frank Ennis, an insurance agent. This evidence revealed that a $100,000.00 life insurance policy was taken out on Mrs. Flippo less than two months before she was murdered:

Q. Go ahead.

A. It is in the amount of $100,000.

---

**32.** The trial court preluded the State from presenting evidence that a homosexual relationship existed between Mr. Flippo and Mr. Boggess.

**33.** This Court has previously observed that " '[w]hile it is permissible to prove the motive which prompted the commission of crime, the failure of the State to discover and prove any

motive therefor is no evidence of the innocence of the accused. Motive constitutes no element of the crime itself.' " *State v. Davis,* 176 W.Va. 454, 467, 345 S.E.2d 549, 562 (1986) (quoting Syl. pt. 5, *State v. Lemon,* 84 W.Va. 25, 99 S.E. 263 (1919)).

Q. And who was the beneficiary on the policy?

A. That was James Michael Flippo.

As to the issue of the tension caused to the Flippo marriage by the relationship Mr. Flippo had with Mr. Boggess, the State relied upon testimonial and documentary evidence. The State called Tamara Cremeans, a member of Mr. Flippo's church, who testified to statements made to her by Mr. Flippo, regarding a land venture Mr. Flippo planned to make with Mr. Boggess:

Q. What else did you talk to him about this property venture?

A. I asked him what Cheryl thought of it.

Q. How did he respond?

A. He responded, "Cheryl is going along with it. She knows she has to, because I'm sick of her right now. She knows if she doesn't go along with it, I'll leave her."

Q. How did that strike you whenever he made a comment like that?

A. Very odd. That was out of character for Michael.

Q. How was it out of character?

A. He would crack jokes from the pulpit and pick on her, but to say that he was sick of her and would leave her was never stated to me before, or anyone that I know of.[34]

Ms. Cremeans also testified that, about a week before Mrs. Flippo was murdered, Mr. Flippo asked her "to pray regarding Cheryl, because she did not like the relationship with Mr. Boggess[.]" There was additional testimony by Ms. Cremeans that indicated Mrs. Flippo's disapproval of Mr. Boggess caused

her to change her seat at the church, once Mr. Boggess began attending the church:

Q. Okay. How did that seating arrangement with Cheryl Flippo change after Joel Boggess—if it did, after Joel Boggess started attending the church?

A. She moved down to the other end of the pew some, away.

Q. Can you remember when it occurred that Mr. Boggess started assuming the seat that Cheryl had kept?

A. When I noticed it was around two weeks prior to her death.[35]

Finally, the State introduced a letter into evidence that was written by Mr. Flippo to Mrs. Flippo. In the letter, Mr. Flippo professed his love for his wife and then made the following comments about his relationship with Mr. Boggess:

... I wish you would let me be happy. But you wont. You are determined to make my life sad.

... You make life miserable over me talking on the phone. I don't understand you.... Why can't I have a friend? Why do you want to own me like a car? Why are you trying to force me to have a friendship with Joel ... in secret? I will not be forced to lie or have a friendship in secret. I've grown past that.

(c) *Staged crime scene.* The State also introduced evidence that the crime scene appeared staged. There was testimony by Detective Burke that items at the crime scene were out of place for an alleged attack by an intruder. For example, Detective Burke stated: "There was no signs on the floor of a struggle, no marks on the floor from the rocking chair or the overturned fireplace

34. The State also introduced a note written by Mrs. Flippo to Mr. Flippo, wherein she stated her position about the property venture:

Dearest Michael,

I am so sorry we fought. I am so tired of going to bed alone, punished! I had decided I wouldn't say anything if you got off the phone in 15 min[utes] but you couldn't do that and then as usual when its your fault you blame someone else. I am sorry we must resolve this in prayer together—this is not God's will for all life.

Please I beg you don't do anything foolish about this land. We can work this out—just don't panic and do *anything* foolish please.

We will work out the land, but not without Luke Michael's approval. Please be safe. I love you. Please be home when I get home from work. I will talk to you at lunch. Forgive me for my part in this mess. I do love you, but I hate this competition you have created. I want a husband—loyal and faithful with my interest *first.*

I love you,
Cheryl.

35. The State also called Angela Perry, a member of Mr. Flippo's church, who testified that Mrs. Flippo did not like Mr. Boggess.

utensils." There was further testimony that "[t]he neatly stacked clothing in the area where the rocking chair appeared to have been—appeared to have been knocked over, the rocking chair apparently was placed there after the attack on Mrs. Flippo." Detective Burke also testified that "the position of the rocking chair did not look right, and the position of the clothing did not look right." Finally, there was testimony by Detective Burke that blood stains were soaked from the floor and placed on the bed, to make it appear that the attack occurred on the bed.[36]

Likewise, Deputy Bryant testified that it had rained during the night of the murder and the ground was soft and wet. He further testified that when he entered the cabin "[t]here was no footprints, no water or anything else on the floor to indicate that somebody had been inside there." Deputy Bryant also testified that no signs existed to show a forced entry into the cabin, nor were there any unaccounted for footprints outside the cabin.[37]

Furthermore, there was evidence that a piece of duct tape was found near Mrs. Flippo's body. The duct tape matched a roll of duct tape that was found in the cabin bathroom. The State presented testimony from Steven King, a latent fingerprint examiner, who explained that a fingerprint was found on the roll of duct tape that matched Mr. Flippo's fingerprint.[38]

Finally, the State presented evidence that a knife was found on Mrs. Flippo's arm. However, Dr. Zia Sabert, assistant medical examiner, testified that Mrs. Flippo did not sustain any knife wounds.

*(d) Self-inflicted wounds.* Mr. Flippo reported that he was attacked and twice knocked unconscious by the alleged intruder. There were also cut marks on Mr. Flippo's legs that he alleged were inflicted on him by the intruder, as the intruder sat on him. Dr. Irvin M. Sopher, former chief medical examiner, testified that he examined Mr. Flippo shortly after the murder of Mrs. Flippo. Dr.

36. Detective Burke addressed the issue as follows:

Q. Based upon your training and experience were you able to reach any conclusions as to how that blood got there?
A. The blood appeared to be more transferred blood, meaning coming from another item. The pillow that was located on the mattress on the left side appeared to have a substantial amount of what appeared to be blood to me. The mattress appeared to have a substantial amount of blood, but there was no, in my opinion, reasonable way of that getting there other than transfer.
It is apparent that there was not a severe strike to the victim while she was in that—if she was in that area, because there was no splatter to substantiate that amount of blood.
Q. What significance, if any, does the condition of the floor play in your determination about this placement of the blood on that mattress?
A. In the—in and near the head area of the victim while the victim was lying on the floor, there were striations in the blood that indicated that an item had been taken through the blood.
That is the only reasonable account that I can come up with that the blood would have been transferred to the mattress area.

37. Deputy Bryant testified on the issue as follows:

Q. Whenever Detective Burke arrived, what information, if any, did you give to him about what you had found?

A. I had advised Detective Burke of every step that I had taken up to that point; that I attempted to make entry from the rear, found that door to be secured, had found a bag sitting between the two doors that fell out when I opened the door, so I did not believe anyone had exited that door and then locked it. I advised Detective Burke that there was no footprints to the rear of the cabin there before I walked on the soft ground, leaving my footprints, so I could look through the rear window to see if there was anyone there.
I advised Detective Burke that there was no footprints on the dry rock of the front door steps there. . . .
. . . .
Q. And you didn't see any footprints coming or going from the front porch either?
A. No, sir. There was no wet, no mud or anything up on the porch.

38. Mr. King testified as follows:

Q. All right. Based upon your examination of this latent and known print, did you come to a conclusion?
A I did.
Q. What is that conclusion?
A. That the latent print and that the known print demonstrated the[y] were made by the same individual?
Q. All, right. And what individual was that?
A. That would be Mr. Flippo.

Sopher opined that the bruises to Mr. Flippo's head were insufficient to render him unconscious.[39] Dr. Sopher also opined that the cuts on Mr. Flippo's legs were self-inflicted.[40]

*(e) Inconsistent statements.* Finally, the jury was presented with an abundance of evidence showing critical inconsistent statements by Mr. Flippo. First, there was evidence that Mr. Flippo stated that he had never been to Babcock State Park, prior to taking Mrs. Flippo there on the evening of her murder. Mr. Morris, the assistant superintendent of the park, testified that he met Mr. and Mrs. Flippo when they arrived at the park. Mr. Morris stated that Mr.

Flippo said the following to him: "And he said—the first thing he said was, 'I'm sorry I'm late. We're late.' He said, 'I've never been here before. I got lost.'" However, the State presented contrary testimony from Mr. Boggess that indicated he had gone to the park with Mr. Flippo two days before Mrs. Flippo's murder in order to be baptized at a park stream, and on at least one other prior occasion while returning from a skiing trip with Mr. Flippo.[41]

Next, the evidence revealed that Mr. Flippo had informed Ms. Jewell that the decision to stay at the park was spontaneous and made on the day he and Mrs. Flippo stayed at the park. However, Ms. Bostic testified

39. Dr. Sopher gave the following testimony:

Q. All right. Dr. Sopher, I think that you were getting ready to State your opinion based on your physical examination and your opinion as a forensic pathologist regarding what you saw on the head of Reverend Flippo. Would you state what opinion you concluded, or your conclusion.
A. Actually, the only injury to the entirety of the head ... was a very faint bluish contusion in this area.
This was very superficial. There was no abrasion of the skin overlying it, there was no skin splittage as one sees from a significant force delivered to the head.
The back of the head showed total absence of injury....
Q. Based upon your experience as a forensic pathologist and as a physician, did the injury or the contusion that you noted to the head of Mr. Flippo, in your opinion, would that injury be sufficient to render him unconscious?
A. It would not.
....
Q. All right. What about the—what about the injuries to the back of Mr. Flippo's head? Did you reach an opinion as to whether or not what you observed there could have rendered him unconscious?
A. Yes, I did.
Q. What was that opinion?
A. Well, number one, there was no injury whatsoever, no swelling of the scalp and no evidence of any impact at all. So, of course, there was nothing there to substantiate an impact that would cause unconsciousness.
Q. Dr. Sopher, if a person had been struck in the head—in this forehead area that we're looking at here, if a person had been struck in the head with, let's say a log or a heavy or blunt object, sufficient enough to render them unconscious, what would you expect to find on that head area?
A. Well, you'd find a considerable bruise. I mean, there's no question about that. And you would find to the skin surface some abrasion

or scraping, and you would find, in all likelihood, from a blow from a blunt object ... you would have a split of the skin. You would have what we call a laceration.
And the reason for that is that when one receives a severe blow to the head from a blunt object, there is, unlike upon your extremities, such as your arm or leg, there is no buffer. There is no soft tissue of an substantial thickness underlying your forehead or your scalp to sustain the energy involved in the impact....

40. Dr. Sopher provided a detailed explanation of his examination of Mr. Flippo's leg injuries. The following question and answer reflects more of a summary of Dr. Sopher's testimony on this issue.

Q. Would these injuries be consistent or inconsistent with an individual sitting on this man's legs facing him, cutting him with a knife?
A. Well, number one, a knife is not involved. These are not incised wounds. They don't penetrate the skin. They're superficial, as I stated, and they are not inflicted by an individual straddling one's lower extremities and inflicting these injuries from a stride of the lower extremities.
Keep in mind that the pattern of these injuries extend from distal to proximal, and they do not fit the pattern of one who would be astride a second party, and find just the opposite.
You find a pattern of deeper abrasion toward the head end of the thigh, and more superficial abrasion toward the knee end of the thigh. Because the usual pattern of inflicting these injuries, if it were to be from below—from a person straddling below, would be a swipe with a deeper injury at the head end and trailing off, and superficial injuries at the—at the knee end, if that were the case. It's just the opposite in this case.

41. Mr. Flippo also informed the police that he may have been to the park previously, but that he did not remember who was with him.

that Mr. Flippo made reservations specifically for Cabin No. 13 two days before he and Mrs. Flippo went to the park.

Yet another inconsistency involved the vehicle Mr. and Mrs. Flippo used to travel to the park. Mr. Flippo told the 911 operator, Deputy Bryant, and Detective Kessler that he drove to the park in his Cadillac and that it was stolen. He also told Deputy Bryant that he did not know who owned the red Camaro parked in front of the cabin. However, Mr. Boggess testified that the red Camaro was his car and that he loaned it to Mr. Flippo to drive to the park. Mr. Boggess further testified that Mr. Flippo had left him the Cadillac. Likewise, Mr. Morris testified that he saw Mr. Flippo driving the "red convertible" into the park with Mrs. Flippo.

Mr. Flippo's explanation of the phone call he made upon arriving at the park was also challenged. Mr. Flippo told Detective Kessler that after he arrived at the park with Mrs. Flippo, he went to a pay telephone to call a patient at a hospital. However, Mr. Boggess testified that Mr. Flippo called him after arriving at the park.

Other comments made by Mr. Flippo were similarly controverted. While Mr. Flippo informed Ms. Jewell that "he couldn't lock the door [of the cabin] because ... they were late checking in and they didn't give them a key[,]" Mr. Morris testified that when he met the Flippos at the park he informed Mr. Flippo "that the cabin would be open and he could lock it from the inside[.]" Similarly, the State called Dawn Mann, a nurse who assisted in treating Mr. Flippo when he arrived at the hospital. Ms. Mann testified that she asked Mr. Flippo if he had lost consciousness during the attack and "he said that there was no loss of consciousness." However, in the statement given to the police

Mr. Flippo asserted that he was knocked unconscious twice.

Still more discrepancies were present in Mr. Flippo's statements regarding his attacker, whether he had checked his wife for vital signs after her attack, and his explanation of why he used a pay phone instead of his cellular phone. First, Mr. Flippo informed the 911 operator that he did not see his attacker.[42] However, Mr. Flippo informed Detective Kessler that he saw a man lying by his bed. He also told Ms. Jewell that he saw "a big, burly man in a pair of blue jeans with a ... toboggan with eyes cut out, but no mouth and no nose[.]" Mr. Flippo also told Rev. Timothy Allen Cremeans, a friend, that "as the man ran away, the man slipped and fell, because it was wet outside, and that he noticed when the man fell, he said something to himself, that the man's shorts were too short."

Next, there was also evidence that Mr. Flippo informed the 911 operator that he did not check any vital signs to see if Mrs. Flippo was alive.[43] However, Mr. Flippo told Detective Kessler and Ms. Jewell that "he laid his head on her chest and could hear her heartbeat."

Finally, Mr. Flippo informed Deputy Bryant and Detective Kessler that he went to the pay telephone to report the crime because his cellular phone was missing. Yet, the police found remnants of the cellular phone in the cabin's fireplace.

Based upon the foregoing summary of all the evidence that was presented against Mr. Flippo, it is clear that there was sufficient evidence, without the photographs of Mr. Boggess, to prove beyond a reasonable doubt that Mr. Flippo killed his wife. Nevertheless, before we may conclude that the improper admission of the photographs constituted harmless error, we must consider

---

**42.** The following exchange occurred between the 911 operator and Mr. Flippo:

> 911 Operator: Okay. What about the guys that hit you. Have they already left?
> Mr. Flippo: I never saw them.
> 911 Operator: You never saw them?
> Mr. Flippo: Somebody hit me with a log.

**43.** The following exchange occurred between the 911 operator and Mr. Flippo:

> 911 Operator: Just calm down. Okay? Calm down. Did you check to see if she had a pulse or anything? If she was breathing? Did you check that before you left?
> Mr. Flippo: No.
> 911 Operator: Okay.
> Mr. Flippo: When she wouldn't wake up, I felt her hand and she had blood in her hair, and I just ran. I didn't know what to do.

whether the photographs had a prejudicial impact on the jury.

2. **Impact of Photographs.** The trial judge's order correctly set out the facts to establish beyond a reasonable doubt that the photographs did not have any prejudicial impact in this case:

12. The Defendant's argument, ... that the 7 photographs, depicting Joel Boggess in and removing wet clothes, were used by the State as a method or means of causing the jury to infer that the Defendant was a homosexual, having some homosexual relationship with Joel Boggess is, wholly and utterly without merit. The photographs, giving them their worst possible interpretation, do not remotely tend to cause such a belief. These photographs show neither any nudity nor are they in any manner or fashion sexually explicit or suggestive, nor are they in any manner reasonably susceptible to any such interpretation. The reason for the existence of said photographs was clearly explained by Boggess as innocent "post-baptism" pictures.

▮▮▮▮▮ The State presented the photographs of Mr. Boggess in the context of over 70 photographs depicting the crime scene and items seized. The photographs of Mr. Boggess were admitted during the testimony of Detective Burke. In presenting the photographs of Mr. Boggess, Detective Burke did nothing more than identify the person depicted in the photographs, the car shown in the photographs, and the place where the photographs were taken. Further, Mr. Boggess testified that the photographs showed him partially undressing after being baptized. We simply cannot find any prejudicial impact from the manner in which the photographs were introduced, nor the substantive content of what the photographs depicted. Consequently, the erroneous admission of the photographs has been shown to be harmless beyond a reasonable doubt.[44]

44. Mr. Flippo has also argued that the State violated the trial court's pretrial order by expressly interjecting the issue of homosexuality into the case. The State contends that this issue is not properly before this Court, because the case was remanded by the United States Supreme Court only on the issue of the seizure of the photographs. We agree with the State. This issue is not properly before this Court and should not have been addressed by the trial court on remand. However, assuming, for the sake of argument, that this issue was properly before this Court and the trial court, the record would support affirming the trial court's ruling. The trial court addressed the issue, in part, as follows:

13. The State, pursuant to prior pre-trial order of the Court, did not raise any issue of homosexuality. Counsel for the Defendant, however, on cross-examination of Joel Boggess, intentionally and specifically raised the issue of homosexuality, being fully aware of the prohibition the State was under and which it had obeyed. Also, counsel for the Defendant, in closing argument, intentionally attempted to raise an issue of homosexuality. The Defendant cannot create a legal loophole, via intentionally, invited error, if any there be, through which he can later gratuitously and freely pass.

It has long been the rule in this State that a party "will not be permitted to complain of error in the admission of evidence which he offered or elicited[.]" Syl. pt. 2, in part, *State v. Bowman*, 155 W.Va. 562, 184 S.E.2d 314 (1971). Where inadmissible evidence is introduced as a result of the examination by the complaining party, the error is deemed invited error. *See State v. Hanson*, 181 W.Va. 353, 363, 382 S.E.2d 547, 557

(1989). Addressing the issue of invited error in *State v. Crabtree*, 198 W.Va. 620, 627, 482 S.E.2d 605, 612 (1996), we made the following observations:

"Invited error" is a cardinal rule of appellate review applied to a wide range of conduct. It is a branch of the doctrine of waiver which prevents a party from inducing an inappropriate or erroneous response and then later seeking to profit from that error. The idea of invited error is not to make the evidence admissible but to protect principles underlying notions of judicial economy and integrity by allocating appropriate responsibility for the inducement of error. Having induced an error, a party in a normal case may not at a later stage of the trial use the error to set aside its immediate and adverse consequences.

Insofar as the trial court addressed the issue and determined that Mr. Flippo invited the error complained of, had the issue been properly before this Court, we would have affirmed the trial court's ruling. *See State v. McCormick*, 168 W.Va. 445, 447, 290 S.E.2d 894, 895 (1981) (finding defendant interjected issue of homosexuality in the case).

We must also take a moment to clarify this Court's position on the trial court's decision to preclude the State from introducing evidence or direct argument of a homosexual relationship between Mr. Flippo and Mr. Boggess. This Court has never held that the State is precluded in all instances from arguing that a defendant killed someone, in part, because of a homosexual relationship with a third party. *See generally, State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535

## IV.

## CONCLUSION

In view of the foregoing, we affirm the trial court's denial of Mr. Flippo's motion for a new trial.

Affirmed.

(1996) (defendant killed her lesbian lover's former boyfriend). So long as the State clearly establishes the relevancy of the homosexual relationship to the crime, such evidence or argument is admissible. *See* Syl. pt. 7, *State v. Adkins,* 170 W.Va. 46, 289 S.E.2d 720 (1982) ("Evidence regarding sexual predilections or conduct is not admissible at trial unless it is clearly relevant."). Consequently, had the issue been brought before this Court prior to trial by the State, we would have in all likelihood found error in the trial court's order prohibiting the State from arguing that Mr. Flippo killed his wife, in part, because she disapproved of a homosexual relationship he had with Mr. Boggess. *See* Syl. pt. 5, in part, *State v. Lewis,* 188 W.Va. 85, 422 S.E.2d 807 (1992) ("The State may seek a writ of prohibition in this Court in a criminal case where the trial court has exceeded or acted outside of its jurisdiction. Where the State claims that the trial court abused its legitimate powers, the State must demonstrate that the court's action was so flagrant that it was deprived of its right to prosecute the case[.]").