**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 22-0363** (Summers County 21-F-61)

**Christopher James Cody,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Christopher J. Cody ("Petitioner") appeals from the Circuit Court of Summers County's final judgment of April 14, 2022, sentencing him for his jury convictions on three counts of possessing controlled substances with intent to distribute and one count of possessing a controlled substance. The State filed a response.[1] On appeal, petitioner alleges that the circuit court erred in denying his motion to suppress the evidence obtained during a warrantless search of his home because the search was allegedly unlawful. Upon our review, finding no substantial question of law and no prejudicial error, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21(c).

On September 8, 2021, West Virginia State Police Trooper First Class Jack C. Woods went to petitioner's home in response to a report of a stolen cell phone. He was informed that petitioner's phone had been taken by petitioner's ex-wife, Angel Cody. When the trooper retrieved the phone, Ms. Cody told him that petitioner was involved in dealing drugs. After some additional investigation of possible drug trafficking by petitioner, the trooper returned the phone to petitioner at his residence. The ensuing discussion and search were captured on the trooper's body cam.

During a discussion in his cruiser, the trooper told petitioner that he had been informed of alleged drug dealing and wanted petitioner's consent to search his residence. Petitioner was repeatedly advised that he did not have to consent, but if the trooper obtained a warrant, the search would be conducted by several officers instead of just the trooper, that there would probably be some publicity on Facebook, and that it might be embarrassing to petitioner's family (petitioner's parents lived nearby on the same road). In addition, if the trooper had to call the sheriff and ask him to obtain a warrant, the house would have to be locked down and no one would be allowed to leave until deputies arrived with the warrant. Petitioner was also told that he was free to leave and free to call his attorney.

---

[1] Petitioner is represented by attorney Joshua D. Brown. Respondent State of West Virginia is represented by Attorney General Patrick Morrisey and Assistant Attorney General Andrea Nease Proper.

1

Petitioner said, "F*** it. Come on," or similar words,[2] and started walking toward his home. The Trooper took this as consent to search, and followed him, at one time asking petitioner to slow down so that he could catch up, which petitioner did. At the suppression hearing, petitioner testified that he meant that the trooper should call the sheriff and ask him to get a search warrant, not that the trooper could come in the house and search without a warrant. He also testified at the suppression hearing that he thought the trooper wanted to "look" instead of "search" and that looking, and searching, were "two different things."

In any event, the trooper entered the house and conducted a search during which he found two boxes: a gray box containing baggies, weights for a scale, a grinder, and a small black box containing controlled substances. He also found $1,024.00 worth of five-, ten- and twenty-dollar bills in petitioner's wallet, which the Trooper later testified were commonly used denominations in drug deals. During the search, petitioner produced a bag of marijuana, placed it on the table in front of him, and said it was his. After the black box was located, petitioner said that he did not realize it was in the house when he authorized the search, thinking that it was under his vehicle. At no time during the search did petitioner clearly tell the trooper to stop searching, or that he withdrew his consent.

At one point during the search, petitioner did say "I change" but this portion of the body cam video is hard to hear, and the parties disagree as to whether these words were followed by "my mind." After the incriminating evidence had been located, petitioner asked "didn't I need to sign consent papers?" Trooper Woods responded that he had petitioner's verbal consent on his body cam video, so he did not need a written consent. When the trooper said this, petitioner did not dispute having given verbal consent.

Following the search, petitioner was taken to the Hinton Detachment of the State Police where he was given a *Miranda*[3] warning, questioned by Trooper Woods and Summers County Sheriff Faris, and gave a statement. The audio recording of his statement contains a confession of drug dealing and a confirmation that the search of petitioner's home had been consensual. Petitioner admits that some of this recording is in his voice but alleges that the tape has been altered and that the statement saying that he had consented to the search was not uttered by him.

A suppression hearing was held on February 16, 2022, and petitioner's motion to suppress evidence was denied because the circuit court found that the search had been consensual, declaring that "[b]ased on the totality of the circumstances, a reasonable person would conclude that [petitioner] had consented" to a search of the residence. A one-day trial was held on February 28, 2022, and petitioner was found guilty on three counts of possession of controlled substances with intent to deliver (one count apiece for methamphetamine, fentanyl, and suboxone) and one count of possession related to marijuana.

---

[2] In his closing argument at trial, petitioner's counsel stated that petitioner said, "F*** it. Let's go." During the suppression hearing, petitioner claimed to have said "F*** it. Let's do this," and then "F*** it. Let's do this. Call the sheriff." The briefs filed by both parties on appeal, however, both state that petitioner said: "F*** it. Come on."

[3] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

We have previously established the following standard of review when considering motions to suppress evidence:

> When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

Syl. Pt. 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

Furthermore:

> In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo.* Similarly, an appellate court reviews *de novo* whether a search warrant was too broad. Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made.

*Lacy*, 196 W. Va. at 107, 468 S.E.2d 719, 722, Syl. Pt. 2. Having determined the applicable standard of review, we proceed to a consideration of the merits.

As the Court has observed, "[t]he Fourth Amendment, as well as article III, section 6 of the West Virginia Constitution, protects individuals in their homes against unreasonable search and seizure. As a general rule, warrantless searches of a person's home are forbidden." *State v. Buzzard*, 194 W. Va. 544, 549, 461 S.E.2d 50, 55, (1995) (citations omitted). This general rule is subject to certain exceptions, such as where "authorities have obtained the voluntary consent of a person authorized to grant such consent." *Id*. In the present case, the State contends that the warrantless search of petitioner's residence was authorized by the petitioner. Petitioner asserts that he did not authorize the search, but should his language and acts be construed as expressing consent, that such consent was coerced, and was therefore invalid. He also asserts that he withdrew his consent during the search.

Initially, we must consider whether petitioner consented to a warrantless search of his dwelling through his words and actions. After some discussion of his choice to voluntarily agree to a search or wait until a search warrant was obtained, petitioner left the trooper's vehicle, saying words to the effect of "F*** it. Come on." He walked toward his house with the trooper following

3

behind him. When the trooper asked him to slow down so that he could catch up, petitioner complied. The trooper then followed him inside through the open door, with petitioner making no attempt to prevent him from entering. Thus, "the facts available to the officer at the moment of entry [were sufficient to] 'warrant a man of reasonable caution in the belief' that the party had voluntarily authorized the officer's entry onto the premises." *Id.* at 550, 461 S.E.2d at 56; a*ccord State v. Jarvis*, No. 14-1154, 2015 WL 7628838, at *2 (W. Va. Nov. 23, 2015) (memorandum decision). As the court observed in Syllabus Point 1 of *State v. Flippo*, 212 W. Va. 560, 575 S.E.2d 170 (2002), "a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'"

Having found that the lower court did not err in finding that petitioner verbally consented to a search, we now consider whether that consent was freely given without duress or coercion. In *Buzzard*, we set out several relevant criteria to consider in determining whether consent to search was voluntarily given:

> The circuit court, and this Court on review, should consider the following six criteria when evaluating the voluntariness of a defendant's consent: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel. While each of these criteria is generally relevant in analyzing whether consent is given voluntarily, no one factor is dispositive or controlling in determining the voluntariness of consent since such determinations continue to be based on the totality of the circumstances.

194 W. Va. at 545-46, 461 S.E.2d at 51-52, Syl. Pt. 3. Applying these factors to the facts of this case, we conclude that petitioner's Motion to Suppress was properly denied by the lower court.

First, we note that petitioner was not in custody when he gave consent to search his house. He was sitting in Trooper Woods's cruiser but had not been arrested or restrained in any way. In fact, he was told that he was free to leave.

Turning to the second factor, petitioner's consent was not obtained through duress or coercion. He was repeatedly told that he did not have to consent to a search and that he was free to call his attorney. In fact, petitioner testified that the trooper was "awful nice" to him. Trooper Woods's statements that a formal search with a warrant might be embarrassing to petitioner and his family, or that the house would have to be locked down and no one would be allowed to leave until the warrant arrived, seem more like statements of fact than threats given the circumstances of this case. *See Jarvis*, 2015 WL 7628838, at *3 (telling a defendant that he could either consent to a search or wait outside in a law enforcement vehicle until a warrant was obtained was not a threat that vitiated consent).

As for the third factor, knowledge of the right to refuse consent, petitioner was frequently told prior to the search that he did not have to consent, and that Trooper Woods would not be "mad" if he refused to do so. Moreover, petitioner was familiar with law enforcement officers obtaining written consents prior to searches, which indicates that he had some awareness of the need to obtain consent in some form.

The fourth factor relates to a defendant's education and intelligence. According to the Presentence Investigation Report, petitioner dropped out of the eighth grade at the age of sixteen. Although petitioner's formal education may have been somewhat limited, the record indicates that he was familiar with the criminal justice system through his many prior brushes with the law and was knowledgeable enough to ask the trooper about whether he should have been asked to sign a written consent.

As for the fifth factor, petitioner's belief that no incriminating evidence would be found during a search, petitioner remarked that he thought a small black box was supposed to be under his vehicle, instead of in his house. During the search, that box was found to contain substances later identified as methamphetamine, fentanyl, and suboxone. Apparently, when he was asked whether he consented to a warrantless search of his house, he did not realize that this box would be inside where it could be found during a search.

The sixth and final *Buzzard* factor is "the extent and level of the defendant's cooperation with law enforcement personnel." *See* 194 W. Va. at 545-46, 461 S.E.2d at 51-52, Syl. Pt. 3. In this case, the evidence indicates that petitioner had a lengthy discussion with the trooper before verbally agreeing to a warrantless search. The evidence also shows that petitioner discussed his drug usage with the trooper, attempted to discount his ex-wife's allegations that he was dealing, slowed down when he walked toward his house so the trooper could catch up with him, opened the door, and allowed the trooper to enter his residence without objection. Once the trooper was inside, petitioner did not expressly withdraw his consent or ask the trooper to stop searching.[4] In fact, he produced a bag of marijuana, placed it on the table in front of him, and said it was his marijuana.

After considering the totality of the circumstances, construing all facts in the light most favorable to the state, and giving particular deference to the findings of the circuit court, we conclude that the lower court did not err in denying petitioner's motion to exclude evidence and in allowing this case to proceed to verdict.

For the foregoing reasons, the circuit court's order of April 14, 2022, is hereby affirmed.

---

[4] Petitioner alleges that he told the trooper that he had changed his mind during the search, but that statement is hard to hear, and reasonable people could disagree over whether the words "my mind" were uttered after "I changed." Moreover, it is not clear whether this statement was directed toward the trooper or toward a woman who was in the house during the search. It is possible that this remark was related to petitioner's attempt to leave a room that was being searched when the trooper wanted him to remain.

5

Affirmed.

**ISSUED:** September 15, 2023

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton
Justice C. Haley Bunn